**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

David Allen, a married man,                    )    No. CV-11-138-PHX-GMS
                                               )
                Plaintiff,                     )    **ORDER**
                                               )
vs.                                            )
                                               )
Quest Online, LLC, an Arizona limited          )
liability company; Greg Wexler and Jane        )
Doe Wexler, husband and wife; Larry            )
O'Rourke, III and Jane Doe O'Rourke,)
husband and wife; Rick Hupp, an)
individual; Greg Klipstein and Jane Doe        )
Klipstein; Bob Carlson, an individual; Jim     )
Haney and Jane Doe Haney, husband and)
wife; Willard Olauson and Jane Doe)
Olauson, husband and wife; Kelly Olauson)
and Janis Doe Olauson, husband and wife;)
Eileen O'Rourke, an individual; Larry)
O'Rourke, Jr. and Janis Doe O'Rourke,)
husband and wife; 3000AD, Inc., a Florida)
corporation; Derek Smart and Jane Doe)
Smart, husband and wife,                       )
                                               )
                Defendants.                    )
_____)

        Pending before the Court are the following motions: (1) a Motion to Dismiss filed by

Defendants Quest Online, LLC ("QOL"),[1] 3000AD, Inc. ("3000AD"), and Derek and Jane

_____

[1] Because this is a diversity case and Quest Online is a defendant domiciled within the
State of Arizona, it removed this case without a basis for doing so. *See* 28 U.S.C. § 1441(b)
(2007). Nevertheless, to the extent that Plaintiff might have objected to removal, he has
failed to timely do so, and has thus waived any such objection. *Lively v. Wild Oats Markets,*

Doe Smart ("Smart") (Doc. 8); (2) a Motion to Dismiss filed by Defendants Gregory and Jane Doe Wexler ("Wexler"), Willard and Jane Doe Olauson ("Willard Olauson"), and Kelly and Janis Doe Olauson ("Kelly Olauson") (Doc. 30); (3) Motion for Preliminary Injunction filed by Plaintiff David Allen (Doc. 1, Ex. 7); and (4) a Motion for Partial Summary Judgment filed by Plaintiff (Doc. 54).  For the following reasons, the Court grants in part and denies in part the Motion to Dismiss filed by Defendants Quest, 3000AD, and Smart; grants the Motion to Dismiss filed by Defendants Wexler, Willard Olauson, and Kelly Olauson; and denies the Motion for Preliminary Injunction and Motion for Partial Summary Judgment filed by Plaintiff.

## BACKGROUND

Plaintiff David Allen alleges that in 2006, he and Defendant Wexler founded QOL, a limited liability company in the business of multi-player online games. Plaintiff ran QOL for more than four years, acting as a Member, Manager, President and CEO. During his tenure at QOL, Plaintiff created a large multi-player online game entitled Alganon.

On or around March 1, 2010, Plaintiff alleges that he was forcibly removed by QOL Member Defendants and replaced by Defendant Derek Smart. On or around June 4, 2010, Smart was appointed as the new Manager by the QOL Member Defendants.[2] On March 25, 2010, Plaintiff filed suit against the Defendants in Maricopa County Superior Court. The suit was subsequently settled out of court on September 27, 2010 through the execution of a Limited Liability Company Membership Interest Purchase Agreement, which also contained a Release Agreement. (Doc. 70). The parties jointly moved to dismiss the action with prejudice.

Plaintiff's Complaint includes a total of twelve counts against Defendants, including:

---

*Inc.*, 456 F.3d 933, 939 (9th Cir.  2006).

[2] Defendants Wexler, Larry O'Rourke III, Hupp, Carlson, Haney, Willard Olauson, Kelly Olauson, Eileen O'Rourke, and Larry O'Rourke (collectively "QOL Member Defendants") all have an equity share in QOL and are considered the QOL Investors.

1   (1) breach of contract; (2) breach of good faith and fair dealing; (3) defamation, libel, and

2   slander; (4) blacklisting; (5) trade libel (injurious falsehood); (6) breach of implied duty; (7)

3   civil conspiracy; (8) negligence; (9) intentional infliction of emotional distress; (10)

4   compensatory damages; (11) consequential damages; (12) punitive damages.   The first

5   Motion to Dismiss, filed on behalf of Defendants Quest, 3000AD, and Smart (Doc. 8), moves

6   the Court to dismiss all counts for failure to state a claim pursuant to Rule 12(b)(6).   The

7   second Motion to Dismiss, filed on behalf of Defendants Wexler, Willard Olauson, and Kelly

8   Olauson (Doc. 30), joins the first Motion, and separately moves for dismissal on the bases

9   of insufficient service and lack of personal jurisdiction.   Before the case was removed to this

10   Court, Plaintiff filed a Motion for Preliminary Injunction (Doc. 1, Ex. 7).   He provided notice

11   to this Court of that motion on April 22, 2011. (Doc. 36).   Finally, Plaintiff filed a Motion for

12   Partial Summary Judgment (Doc. 54) against Defendant Smart on the claims of breach of

13   contract, breach of good faith and fair dealing, defamation, trade libel (injurious falsehood),

14   and negligence.

**DISCUSSION**

15

16   **I.      Motion to Dismiss filed by Defendants Quest, 3000AD, and Smart**

17        **A.      Legal Standard**

18        To survive dismissal for failure to state a claim pursuant to Federal Rule of Civil

19   Procedure 12(b)(6), a complaint must contain more than "labels and conclusions" or a

20   "formulaic recitation of the elements of a cause of action"; it must contain factual allegations

21   sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*,

22   550 U.S. 544, 555 (2007).   While "a complaint need not contain detailed factual allegations

23   . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'"

24   *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) (quoting *Twombly*,

25   550 U.S. at 570).   "A claim has facial plausibility when the plaintiff pleads factual content

26   that allows the court to draw the reasonable inference that the defendant is liable for the

27   misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citing *Twombly*, 550

28   U.S. at 556).   The plausibility standard "asks for more than a sheer possibility that a

1  defendant has acted unlawfully.  Where a complaint pleads facts that are 'merely consistent

2  with' a defendant's liability, it 'stops short of the line between possibility and plausibility of

3  entitlement to relief.'" *Id.* (internal citations omitted) (quoting *Twombly*, 550 U.S. at 557).

4      When analyzing a complaint for failure to state a claim under Rule 12(b)(6), "[a]ll

5  allegations of material fact are taken as true and construed in the light most favorable to the

6  nonmoving party." *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996).  However, legal

7  conclusions couched as factual allegations are not given a presumption of truthfulness, and

8  "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a

9  motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998).

10     The Court must construe the Complaint liberally since Plaintiff is proceeding pro se.

11 *See Hughes v. Rowe*, 449 U.S. 5, 9 (1980) ("It is settled law that the allegations of [a pro se

12 plaintiff's] complaint, 'however inartfully pleaded' are held 'to less stringent standards than

13 formal pleadings drafted by lawyers.'") (citations omitted); *Eldridge v. Block*, 832 F.2d 1132,

14 1137 (9th Cir. 1987) ("The Supreme Court has instructed federal courts to liberally construe

15 the 'inartful pleading' of pro se litigants.") (citation omitted); *Ashelman v. Pope*, 793 F.2d

16 1072, 1078 (9th Cir. 1986) ("[W]e hold [plaintiff's] pro se pleadings to a less stringent

17 standard than formal pleadings prepared by lawyers."). Nevertheless, even pro se litigants

18 are held to the requirements of the federal and local rules, and a failure to appropriately

19 follow those rules may result in sanctions up to dismissal. *Ghazali v. Moran*, 46 F.3d 52, 54

20 (9th Cir. 1995).[3]

21     **B.    Analysis**

22          **Count 1: Breach of Contract**

23     Plaintiff alleges that Defendant Smart breached the binding and enforceable Release

---

[3] Plaintiff is reminded that Local Rule 7.2 provides that "[u]nless otherwise permitted by the Court, a motion including its supporting memorandum, and the response including its supporting memorandum, each shall not exceed seventeen (17) pages, exclusive of attachments and any required statement of facts." Should Plaintiff choose to not comport with this rule in future submissions, the Court will strike the materials.

1   Agreement by "posting, republishing, linking, communicating and hosting defamatory

2   materials and making defamatory statements related to [Plaintiff]." (Doc. 1, Ex. 2, ¶ 219).

3   Specifically, Plaintiff alleges that Smart "purposely published and republished materials to

4   the public space knowing they would persist and be replicated by other individuals and

5   websites," and "purposely republished previously removed defamatory materials to support

6   his continued agenda of inflicting harm upon Allen and ignoring the terms of the Settlement."

7   (*Id.* at ¶¶ 220–221). Plaintiff alleges that these actions are in violation of the non-

8   disparagement provision of the Agreement, which provides that Defendant "will not make,

9   or cause to be made, any disparaging remarks or statements" or "engag[e] in any other

10  conduct intended to negatively affect the reputation." (*Id.* at ¶ 217).

11          Under Arizona law, a plaintiff asserting a claim for breach of contract must

12  demonstrate the existence of a contract between plaintiff and defendant, breach of that

13  contract by defendant, and resulting damage to plaintiff. *Frank Lloyd Wright Found. v.*

14  *Kroeter*, 697 F.Supp.2d 1118, 1125 (D. Ariz. 2010). The parties do not dispute the existence

15  or authenticity of the Agreement, entered on September 27, 2010.[4] As alleged by Plaintiff,

16  §1(c) of the Release Agreement provides the following:

17                  The Parties will not make, or cause to be made, any disparaging
                    remarks or statements about or concerning the other. This restriction
18                  includes, but is not limited to, posting disparaging remarks on the
                    internet (whether anonymously or under another name), providing
19                  disparaging statements in interviews, recirculating, republishing, or
                    reposting previously authored disparaging remarks or statements, or
20                  engaging in any other conduct intended to negatively affect the
                    reputation of another Party.

21

22  Thus, to the extent Plaintiff is alleging that Smart violated the non-disparagement provision

23  

24          [4] Because the Release Agreement is referenced extensively in Plaintiff's Complaint,
    the Court may consider it in resolving Defendants' Motion to Dismiss. *See Van Buskirk v.*
25  *Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002) (noting that documents outside
    of the pleadings may be considered if they are "referenced extensively" in the pleadings); *see*
26  *also Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (holding that a district court may
    consider the "contents of the complaint" and "evidence on which the complaint 'necessarily
27  relies' if: (1) the complaint refers to the document; (2) the document is central to the
    plaintiff's claim; and (3) no party questions the authenticity of the copy attached").

28

of the Release Agreement *after* it was executed, he has satisfied the breach element. This would include Plaintiff's allegations regarding the following defamatory actions: 1) the September 29, 2010 press release (Doc. 1, Ex. 2, ¶¶ 48–53), 2) Smart's public post on September 28, 2010 (*Id.* at ¶ 93), 3) the Allison & Taylor reference check (*Id.* at ¶¶ 63–67), and 4) Smart's interview with "Lore Hound" on December 9, 2010 (*Id.* at ¶¶ 113–114).[5]

To the extent, however, that Plaintiff's general allegations recount postings and other materials which existed prior to the September 27, 2010 effective date of the Agreement, those claims are barred by § 1(b) of the Release Agreement.[6] The Release provides:

> Allen . . . releases QOL, the Members, Derek Smart, 3000 AD, and Millenium Trust, and each of them, as well as their respective employees, members, spouses and attorneys [ ] from any and all claims asserted in the Lawsuit or that could have been asserted in the Lawsuit, by reason of any matter, cause, or claim arising prior to the date of this Release Agreement.

While Plaintiff alleges that § 1(c) of the Release Agreement indicates that Defendants are "obligated to remove any previous press releases that are engaging in defamatory harm", (Doc. 1, Ex. 2, ¶ 61; *see also* ¶¶ 171–72), a plain reading of § 1(c) does not support such an interpretation. Section 1(c) does not impose on any Party an affirmative obligation to remove or delete previously published interviews, blogs, web postings, or other articles from the Internet, or to see that third parties remove or delete such materials. Thus, Allen cannot satisfy the breach element by relying on Defendants' alleged failure to remove previously posted material because, pursuant to § 1(b), Plaintiff is barred from asserting claims that could have been raised prior to the date of the Agreement. Nevertheless, to the extent

---

[5] The Court cannot precisely determine from the face of the Complaint, beyond what has been noted, which allegations fall before or after the effective date of the Release Agreement.

[6] These include the June 4, 2010 press release (*Id.* at ¶ 85), the September 7, 2010 post on the VooddooExtreme3D message board while allegedly posing as a *Sock Puppet* (*Id.* at ¶ 127), and allegations that Smart made public statements designed to take credit for the work of Allen and others after "only a few weeks" or "less than 60 days" after being put in control of QOL, (*Id.* at ¶¶ 174–200).

1   Plaintiff alleges that Smart modified previously posted material and re-posted and re-
2   published them, (*See* Doc. 1, Ex. 2, ¶¶ 77, 104–105, 109), or specifically referenced and
3   linked to material that existed prior to the Agreement in material that was posted subsequent
4   to it (*Id.* at ¶¶ 96, 99, 111), those actions would not be barred by the release provision.
5   Therefore, Plaintiff has adequately pled facts to support the breach element of his claim to
6   the extent that he relies on allegedly disparaging remarks made *after* the execution of the
7   Agreement.[7]

8        Finally, construing the Complaint liberally, Plaintiff has adequately pled resulting
9   damages, including that the statements caused "irreparable harm to [his] reputation, business
10  standing, integrity, and professional career." (¶ 142). Specifically, he alleges damage to his
11  source of future income, harm to his professional and personal credibility, and his ability to
12  conduct business in an industry in which he has experience. (¶ 143).

13       Additionally, in his general allegations, Plaintiff asserts that Defendants also breached
14  § 2.1(e) of the Membership Agreement, which provides that Allen may keep the MSDN
15  Subscription, by not turning over the subscription after the settlement. (¶ 144–45). Although
16  Defendants assert that the reason the subscription was not turned over is because it had
17  expired, Plaintiff contends that the subscription still has value despite being expired because
18  it would allow Plaintiff to purchase a new subscription at a discounted price. (Doc. 13 at 18).
19  Plaintiff has pled sufficient facts to survive dismissal of his breach of contract claim in this
20  regard.

21       Plaintiff's allegations against QOL and 3000 AD pursuant to the theory of respondeat
22  superior fails because that theory only exists in the context of tort claims, not breach of

23

24       [7] In his response, Plaintiff indicates that Defendant continued to make disparaging
25  remarks about him after the Complaint in the present action was filed. Specifically, Plaintiff
    references a series of emails sent from Smart to Plaintiff, with QOL investors bcc'd, in
26  January 2011, and an interview with the website "Rock, Paper, Shotgun" on February 2,
27  2011. (Doc. 13 at 7–11). Plaintiff's claims are governed by his Complaint. *Kirby v. Atiyeh*,
    814 F.2d 565, 567 (9th Cir. 1987). To the extent such matters are not already covered by the
28  existing Complaint, Plaintiff cannot amend by raising additional claims in his motion papers.

contract actions. The doctrine of respondeat superior imposes vicarious liability on an employer for the torts of an employee if they are committed within the scope of his employment. *Baker ex rel. Hall Brake Supply, Inc., v. Stewart Title & Trust of Phx., Inc.*, 197 Ariz. 535, 540, 5 P.3d 249, 254 (App. 2000). However, because Plaintiff also alleges that QOL and 3000 AD may be directly liable for breaching the contract (¶ 224), and they are both parties to the Agreement, his claim against them survives. Thus, to the extent that Plaintiff does not rely on events that occurred prior to the Release Agreement, he has alleged sufficient facts with regard to his breach of contract claim to survive dismissal.

## Count 2:  Breach of Good Faith and Fair Dealing

A covenant of good faith and fair dealing is legally implied in every contract, *Wells Fargo Bank v. Ariz. Laborers,* 201 Ariz. 474, 38 P.3d 12, 28 (Ariz. 2002). This covenant prohibits a party from acting in such a way that would prevent another party from receiving the benefits and entitlements of their agreement. *Id.* Either party can breach the covenant of good faith and fair dealing by exercising discretion under the contract in such a way as to deny the other party a reasonably expected benefit of the bargain. *Id*. Plaintiff alleges that Smart "has not acted in good faith and has not dealt fairly with Allen, and has otherwise breached his duties" as referenced in count one. (¶ 233). To the extent that Plaintiff has stated a breach of contract claim, his breach of implied covenant of good faith and fair dealing survives as well. Therefore, Plaintiff's breach of the implied covenant of good faith and fair dealing is adequately pled and survives dismissal for the same reasons stated with respect to count one.

## Count 3:  Defamation, Libel, and Slander[8]

Plaintiff alleges that Smart "published or caused to be published false and defamatory statements and communications which Smart knew or should have known were a violation of [§ 1(c) and (d)] of the Settlement and would be republished." (¶ 240). Because Plaintiff

---

[8] The law of defamation encompasses both libel and slander. *Boswell v. Phx. Newspapers, Inc*., 152 Ariz. 1, 730 P.2d 178, 183 n.4 (App. 1985), approved as supplemented by *Boswell v. Phx. Newspapers, Inc.*, 152 Ariz. 9, 730 P.2d 186 (1986).

alleges that he is a public figure,[9] he faces a higher burden in his defamation claim. *Dombey v. Phx. Newspapers, Inc.*, 150 Ariz. 476, 481, 724 P.2d 562, 567 (1986). Specifically, Plaintiff cannot collect damages unless he proves that Defendants' statements were made with actual malice. *Id*. Thus, in order to recover damages for defamation a public figure must prove that: (1) a speaker made a false statement concerning the public figure; (2) the statement was defamatory; (3) the statement was published to a third party; (4) the speaker made the statement with actual malice; and (5) the public figure was damaged as a result of the statement. *Morris v. Warner*, 160 Ariz. 55, 62, 770 P.2d 359, 366 (App. 1988). "To be defamatory, a publication must be false and must bring the defamed person into disrepute, contempt, or ridicule, or must impeach plaintiff's honesty, integrity, virtue, or reputation." *Godbehere v. Phx. Newspapers, Inc.*, 162 Ariz. 335, 341, 783 P.2d 781, 787 (1989).

As with the previous two counts, Plaintiff's defamation claim is necessarily limited to defamatory actions or materials that came about after the effective date of the Release Agreement.

The September 29, 2010 press release provides, in part, that

> Quest Online, LLC, today announced that the lawsuit filed in the Maricopa County Superior Court (Case #CV2010-010391) in June 2010 against previous LLC Manager and Alganon creator, David Allen, has been settled with the purchase of Allen's equity in the LLC; and that Allen is no longer associated with Quest Online, LLC.

(*Id*. at ¶ 48). Plaintiff alleges that the press release was "purposely misleading because Quest Online did not file the Previous Lawsuit against Allen. Just the opposite, Allen filed the Previous Lawsuit against Defendants." The Court takes judicial notice of the Membership Interest Purchase Agreement and Release Agreement entered into between the parties on September 27, 2010. *See discussion supra* n.3.  The Purchase Agreement indicates that while Plaintiff initially filed the lawsuit in Superior Court, "in that Lawsuit Purchaser [QOL] also asserted counterclaims against Seller." (Doc. 70). The Release Agreement also provides that

---

[9] *See* Doc. 1, Ex. 2, ¶ 30 ("Allen is a public figure and recognized for his work in co-founding QOL and creating Alganon.").

"QOL, the Members, Derek Smart and 3000 AD collectively and individually release David Allen and his spouse from all claims against him asserted in the Lawsuit." (*Id*.). Based on these facts, Plaintiff alleges that the "word play" in the press release is "designed to mislead the public and inflict harm upon Allen and his reputation by insinuating Allen was sued and then settled due to the countersuit filed by the Defendants." (Doc. 1, Ex. 2, ¶ 50).  At this stage of the litigation Plaintiff has pled sufficient facts to defeat a 12(b)(6) motion.  Plaintiff has satisfied the actual malice element at this stage by pleading that "Smart acted with reckless disregard in making such statements and comments" (¶ 247). *See Citizen Publ'g Co. v. Miller*, 210 Ariz. 513, 115 P.3d 107, 111 n.2 (2005) (actual malice requires that defendants either have knowledge that their statements were false or that they recklessly disregarded whether it was false or not). Finally, Plaintiff alleges that as a result he suffered permanent damage to his reputation and career. (¶ 255). Thus, to the extent Plaintiff's defamation claim is based on the press release, the claim survives dismissal at this stage.

Plaintiff also alleges that Smart's September 28, 2010 blog post, "Let Sleeping Dogs Lie", "had the purpose of inflicting harm by discrediting, attacking, and defaming Allen and includes numerous fabrications and inaccuracies." (¶ 94). Plaintiff also alleges that the blog post references earlier posts, including one from March 2010, wherein Smart states that Allen did not depart, but rather that Smart fired him for insubordination and for acting against the best interests of the company. (¶¶ 96–99). Plaintiff alleges that this was inaccurate because Allen never worked for Smart, thus Smart never had the authority to fire him. (*Id*.). For the reasons set forth above, Plaintiff has also sufficiently pled the actual malice and damages elements. Accepting all allegations of material fact as true and construing them in light most favorable to Plaintiff, the defamation claim survives Defendants' motion to dismiss in so far as it relies on the September 28, 2010 blog post.

Plaintiff's allegations regarding Smart's interview with "Lore Hound", an online gaming website, on December 9, 2010 (*Id*. at ¶¶ 113–114) similarly survives dismissal. Plaintiff alleges that the interview contains numerous false and defamatory statements, including the following: "When I took over the Alganon team earlier this year, *milestones*

*were pretty much nonexistent and the development was, well, all over the place.* Which explains the state in which the game was when it was first released in late 2009 in an unfinished form. *It also explained all the previously missed dates, a lot of money wasted, etc*". (¶ 114). Even though Smart refrains from directly referencing Allen in his statements, under Arizona law, "[t]o be actionable as a matter of law, defamatory statements must . . . reasonably relate to specific individuals. While the individual need not be named, the burden rests on the plaintiff to show that the publication was 'of and concerning' him." *Hansen v. Stoll*, 130 Ariz. 454, 458, 636 P.2d 1236, 1249 (App. 1981); *see also* RESTATEMENT (SECOND) OF TORTS § 564 cmt. b ("It is not necessary that the plaintiff be designated by name; it is enough that there is such a description of or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended.").[10] Accepting as true Plaintiff's allegation that the "gaming community is fully aware Allen ran QOL before Smart was put in control," Plaintiff has adequately alleged that the interview involved false and defamatory statements against Allen to survive Defendants' 12(b)(6) motion.

Finally, Plaintiff alleges that in October 2010 he "hired Allison Taylor, a law firm specializing in reference checks to conduct a reference check for Quest Online to ensure no improper references or activity engaging in a breach of the Settlement Agreement was taking place." (¶ 63). Allen alleges that he subsequently received a report from the firm documenting their contact with QOL and Smart to ask questions in reference of Allen as a company looking to hire Allen as Chief Technical Officer. (¶ 64). The reference Smart provided for Allen was allegedly defamatory because, among other things, he indicated that the QOL investors were not happy with Allen, that Allen had sued QOL, and that QOL had countersued him for fraud and embezzlement. (¶ 65). In addition, Smart allegedly stated that Allen "had no skills" and "rated him at the lowest rating for nearly every single question." (¶ 66). The facts, as alleged, indicate that Allen pretended to be an employer so that he could

---

[10] "Arizona views the Restatement as authority for resolving questions concerning rules  in defamation cases." *Burns v. Davis*, 196 Ariz. 155, 162, 993 P.2d 1119, 1126 (App. 1999) (citing *Sanchez v. Coxon*, 175 Ariz. 93, 95, 854 P.2d 126, 128 (1993)).

1   utilize the law firm to conduct a reference check on himself with the sole purpose of
2   determining whether the Agreement was being breached. Thus, Plaintiff simply cannot meet
3   the damages element with respect to the comments Smart made to the representative from
4   Allison & Taylor. However, Plaintiff also alleges that Smart had "spoken with others" in
5   relation to the defamatory statements made to Allison & Taylor. (¶¶ 72, 243). Thus, to the
6   extent that Plaintiff alleges that Smart's communications with others in relation to the
7   defamatory statements made to Allison & Taylor damaged his reputation and career, his
8   claim survives.

9        Plaintiff further alleges that QOL and 3000 AD are directly liable and/or vicariously
10  liable for Smart's defamation pursuant to respondeat superior. Neither Defendant can be held
11  directly liable for Smart's allegedly defamatory actions because Plaintiff has alleged no facts
12  to suggest that either QOL or 3000 AD directly engaged in the defamatory actions. However,
13  Plaintiff's allegation that "Smart held the position of Manager and/or President at QOL
14  during these allegations", (¶ 218), and that some of the allegedly defamatory materials were
15  hosted on the QOL website is sufficient to give rise to a reasonable inference that Smart was
16  acting within the scope of his employment at this stage of the litigation. On the contrary
17  though, Plaintiff's mere allegation that 3000 AD is a "Florida corporation" "owned in whole
18  or in part by Smart" and that Smart's "representation of 3000 AD is implied" does not plead
19  facts sufficient to indicate why 3000AD should be held liable under respondeat superior.
20  Defendant 3000 AD is dismissed, without prejudice.  In sum, Plaintiff's defamation claims
21  survives dismissal against Defendants Smart and QOL.

22                           **Count 4: Blacklisting**

23       Plaintiff alleges that Smart's interview with Allison & Taylor "shows intention to
24  prevent Allen from securing work" (¶ 260) in violation of Arizona's Blacklisting statute,
25  A.R.S. § 23-1361. As previously set forth, Plaintiff alleges that in October 2010 he hired
26  Allison & Taylor to ask questions in reference of Allen as a company looking to hire Allen
27  as Chief Technical Officer. (¶¶ 63–64).

28       Arizona's blacklisting statute provides that "[a] person commits blacklisting if he

knowingly exchanges, solicits or gives out any labor blacklist." § 23-1361. The statute defines "blacklist" as

> any understanding or agreement whereby the names of any person or persons, list of names, descriptions or other means of identification shall be spoken, written, printed or implied for the purpose of being communicated or transmitted *between two or more employers of labor*, or their bosses, foremen, superintendents, managers, officers or other agents, whereby the laborer is prevented or prohibited from engaging in a useful occupation.

§ 23-1361 (emphasis added). Plaintiff's claim for blacklisting fails as a matter of law because he has not alleged that Smart entered into an "understanding or agreement between employers" to interfere with Allen's ability to obtain employment. (Doc. 8 at 13). The facts, as alleged, indicate that Allen instigated the reference check under false pretenses so that he could utilize the law firm to test whether the Agreement was being breached.  Therefore, Plaintiff has not, and cannot, allege that Smart entered into an agreement with another "employer of labor" to interfere with Allen's employment.  Indeed, another employer never existed.

Accordingly, Plaintiff's claim for blacklisting is dismissed, without prejudice, for failure to state a claim upon which relief can be granted.

### Count 5:  Injurious Falsehood/Trade Libel

To state claim for trade libel, Plaintiff must prove that Defendants intentionally published an injurious falsehood disparaging the quality of his property or product, with resulting pecuniary loss. *Gee v. Pima Cnty.*, 126 Ariz. 116, 612 P.2d 1079 (1980).[11] Within his specific allegations, Plaintiff does not indicate the basis for this claim as he makes no reference to a libelous activity on the part of Defendants with regard to Plaintiff's product or business.  Because it remains unclear to the Court on what basis Plaintiff sets forth this claim, count five is dismissed with leave to amend.

### Count 6: Breach of Implied Duty

---

[11] "In the modern law the tort of 'injurious falsehood' is the general umbrella term for a collection of torts such as . . . 'product disparagement' or 'trade libel' . . . ." *See Fillmore v. Maricopa Water Processing Sys.*, 211 Ariz. 269, 120 P.3d 697, 703 (2005).

1    In Count six, Plaintiff claims that "Defendants have wrongfully exercised the

2  contractual power for a reason beyond the risks that Allen assumed and for a reason

3  inconsistent with Allen's justified expectations." (¶ 284). He clarifies within the Complaint

4  that this "qualifies as a breach of the implied duty of good faith" and cites to *Wells Fargo*

5  *Bank v. Arizona Laborers, Teamsters and Cement Masons*, an Arizona Supreme Court case

6  that deals, in part, with a breach of the implied covenant of good faith and fair dealing.  201

7  Ariz. 474, 38 P.3d 12.

8    As Defendants assert in their motion, this count appears to be a repetition of count 2,

9  which alleges a breach of good faith and fair dealing. In response, Plaintiff contends that

10  there is a difference between an implied covenant of good faith and fair dealing and an

11  "implied duty." However, the case that Plaintiff cites in his complaint and those that he relies

12  on in his response all concern a duty of good faith and fair dealing. Specifically, Plaintiff's

13  reliance on *Emerson Radio Corp. v. Orion Sales, Inc.*, 80 F.Supp.2d 307 (D.N.J. 2000), to

14  conclude that the "the duty of good faith and fair dealing is broader than an implied duty

15  . . ." is inaccurate. The remainder of the sentence, which Plaintiff leaves out, reads "to use

16  best efforts in marketing." *Id*. The case distinguishes between the implied duty of good faith

17  and fair dealing and an implied obligation to use best efforts, a duty which has no relevance

18  to the facts alleged. Accordingly, count six is dismissed, with prejudice, because it is

19  identical to count 2.

20                            **Count 7:  Civil Conspiracy**

21    Plaintiff alleges that "each Defendant joined in, acted in concert with, and conspired

22  with the other to persist defamatory materials of all kinds throughout the internet without any

23  regard to obligations defined within the Settlement Agreement to remove or prevent the

24  propagation of said material, resulting in committing the tortious acts alleged herein." (¶

25  294). "[L]iability for civil conspiracy requires that two or more individuals agree and

26  thereupon accomplish an underlying *tort* which the alleged conspirators agreed to commit."

27  *Wells Fargo Bank*, 201 Ariz. at 498, 38 P.3d at 36 (internal quotation marks and citation

28  omitted) (emphasis added). Thus, to the extent Plaintiff is alleging that the purported

conspiracy was to disregard the obligations defined in the Agreement, the claim fails as a matter of law because conspiracy requires an agreement to commit a tort, and a breach of contract is not a tort.

To the extent Plaintiff alleges that the purported conspiracy was to accomplish the underlying defamation tort, he must allege "specific facts showing an agreement and concerted action." *Wasco Prods., Inc. v. Sw. Techs., Inc.*, 435 F.3d 989, 990–91 (9th Cir. 2006) (quoting *Montgomery v. City of Ardmore*, 365 F.3d 926, 940 (10th Cir. 2004)). "The existence of a conspiracy may sometimes be inferred form the nature of the acts done, the relations of the parties, the interests of the alleged conspirators, and other circumstances. However, a plaintiff must allege specific facts which support the inference of an agreement." S. *Union Co. v. Sw. Gas Corp.*, 165 F.Supp.2d 1010, 1021 (D. Ariz. 2001) (internal quotation marks and citation omitted).

In his specific allegations relating to this count Plaintiff merely states that "Defendants have formed and operated together in furtherance of common agenda executing harm against Allen for mutual benefit" (¶ 297). In his general allegations regarding conspiracy, Allen states that while the Defendants were aware of the defamatory materials that Smart had "planted throughout the internet" they "took no action of any kind to clean up or give direction to have the defamatory materials cleaned up, or to prevent additional defamatory materials from being publicly republished and distributed." (¶ 211). At most, Plaintiff alleges that because Defendants took no action to remove previously released materials, or to prevent Smart from releasing new material, they must have "actively collaborated in an effort to defame, discredit, harm, and prevent Allen from securing acceptable gainful work." (¶ 212). Plaintiff's complaint lacks the factual specificity required to support a civil conspiracy claim based on a concerted effort to defame. *See Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 626 (9th Cir. 1988) ("A mere allegation of conspiracy without factual specificity is insufficient."). Plaintiff has failed to allege specific facts that would establish that the Defendants formed some agreement to defame Allen; therefore, the Court dismisses this claim, with leave to amend.

1

### Count 8: Negligence

2   Negligence claims are established by proving the existence of a duty of care, a breach

3   of that duty by the defendant, causality between the defendant's conduct and the resulting

4   injury, and actual damages. *Gipson v. Kasey*, 214 Ariz. 141, 143, 150 P.3d 228, 230 (2007).

5   For a negligence claim to proceed, Plaintiff must establish the existence of Defendants' duty

6   in the pleadings. *Markowitz v. Ariz. Parks Bd.*, 146 Ariz. 352, 354, 706 P.2d 364, 366 (1985)

7   ("Whether the  defendant owes the plaintiff a duty of care is a threshold issue; absent some

8   duty, an action for negligence cannot be maintained."). Duty is defined as an "obligation,

9   recognized by law, which requires the defendant to conform to a particular standard of

10  conduct in order to protect others against unreasonable risks of harm." *Id.*

11  Plaintiff alleges that Defendants were negligent by "supporting Smart and putting him

12  in control of QOL." (¶ 305). He contends that "Defendants conduct falls below the standard

13  of behavior established by law for the protection of others against unreasonable risk of

14  harm." (*Id.*). To the extent Plaintiff may have asserted a duty owed to him as the outgoing

15  President of QOL, Plaintiff's claim is barred by the clear terms of the release provision of

16  the Agreement. According to his own allegations, Smart was appointed Manager by QOL

17  Member Defendants on or around June 4, 2010, well before the effective date of Release

18  Agreement, and Plaintiff could have asserted any claims he may have had against Defendants

19  for their decision to hire Smart during the previous suit.

20  Moreover, to the extent that Plaintiff alleges that Defendants had a duty to perform

21  per  the terms of the Settlement Agreement (¶ 307), such a claim sounds in contract, and has

22  been addressed in Counts one and two. Simply put, Plaintiff has failed to point to any duty

23  of care owed to him by Smart separate and apart from that owned by virtue of the parties'

24  contractual relationship. Because Plaintiff has failed to allege any facts to support the

25  threshold issue of the existence of a duty, the negligence claim is dismissed, without

26  prejudice.

27

### Count 9:  Intentional Infliction of Emotional Distress

28  Plaintiff claims that Defendants committed the tort of intentional infliction of

1    emotional distress by "engag[ing] in intentional behavior which has inflicted extensive harm

2    of emotional distress upon Mr. Allen through public attacks, defamation, destruction of

3    reputation and credibility, using the company Allen built as a platform for the basis of the

4    allegations herein, and harassment." To recover for intentional infliction of emotional

5    distress, Plaintiff must prove that (1) the Defendants' conduct was "extreme" and

6    "outrageous"; (2) the Defendants either intended to cause emotional distress or recklessly

7    disregarded the near certainty that distress would result from the conduct; and (3) the conduct

8    caused Plaintiff severe emotional distress. *See Citizen Publ'g Co.*, 210 Ariz. at 516, 115 P.3d

9    at 110.

10          To satisfy the first element of this inquiry, Plaintiff must show that the Defendants'

11   acts were "'so outrageous in character and so extreme in degree, as to go beyond all possible

12   bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized

13   community.'" *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 183 Ariz. 550, 554, 905 P.2d 559,

14   563 (App. 1995) (quoting *Cluff v. Farmers Ins. Exch.*, 10 Ariz.App. 560, 562, 460 P.2d 666,

15   668 (App. 1969)). It is not enough "that the [Defendants have] acted with an intent which is

16   tortious or even criminal, or that [they have] intended to inflict emotional distress, or even

17   that [their] conduct has been characterized by 'malice,' or a degree of aggravation which

18   would entitle the plaintiff to punitive damages for another tort." RESTATEMENT (SECOND) OF

19   TORTS § 46, cmt. d (1965). Viewing the facts in the light most favorable to Plaintiff and

20   assuming that Allen suffered harm to his reputation and credibility as well as financial harm

21   as a result of Smart's actions, including interviews, press releases, blog posts, and internet

22   postings after the effective date of the Release Agreement, this does not, in itself,

23   demonstrate conduct by the Defendants that is "so extreme in degree, as to go beyond all

24   bounds of decency." *See Mockler v. Multnomah Cnty.*, 140 F.3d 808, 814 (9th Cir. 1998)

25   (noting that a name-calling incident was insufficient to give rise to a claim for intentional

26   infliction of emotional distress); *see also Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d

27   1379, 1388 (10th Cir. 1991) (holding that an employer did not commit intentional infliction

28   of emotional distress when it called an employee derogatory names and accused him of

1   criminal conduct). Without more, Plaintiff fails to plead factual content that allows the Court

2   to draw the reasonable inference that Defendants may be liable for intentional infliction of

3   emotional distress. Therefore, the claim is dismissed.

4                              **Counts 10-12: Damages**

5          In Counts 10 through 12, Plaintiff asserts claims for compensatory, consequential and

6   punitive damages. To the extent that counts 10 through 12 seek to assert independent claims

7   for damages separate from a legal wrong, these counts are dismissed for failure to state a

8   claim upon which relief may be granted. Damages cannot stand alone as a separate claim.

9   *See, e.g., Sisemore v. Farmers Ins. Co. of Ariz.*, 161 Ariz. 564, 566, 779 P.2d 1303, 1305

10  (App. 1989) (finding that a request for punitive damages does not state a separate claim for

11  relief under Arizona law). Rather, these counts appear to be designed to invoke certain

12  remedies. Therefore, while counts 10 through 12 are dismissed as separate claims, they are

13  not foreclosed to the extent that they satisfy the damages element, where relevant, of the

14  aforementioned substantive claims.

15         Moreover, Defendants move to dismiss Plaintiff's demand for punitive damages as

16  a matter of law because they are not available in contract actions. *See Cont. Nat'l Bank v.*

17  *Evans*, 107 Ariz. 378, 382, 489 P.2d 15, 19 (1971). While punitive damages cannot be

18  awarded for a breach of contract, they are recoverable when there is an accompanying tort.

19  *Miscione v. Bishop*, 130 Ariz. 371, 374–75, 636 P.2d 149, 152–53 (App. 1981). Because

20  Plaintiff's breach of contract claim constitutes a tort, the claim for punitive damages survives.

21  **II.    Motion to Dismiss filed by Defendants Wexler, Willard Olauson, and Kelly**
        **Olauson**

22

23         **A.    Legal Standard**

24         Under Rule 12(b)(5), a defendant may move to dismiss an action if service of process

25  is insufficient. FED. R. CIV. P. 12(b)(5); *accord Direct Mail Specialists v. Eclat Computerized*

26  *Techs., Inc*., 840 F.2d 685, 688 (9th Cir. 1988) ("[a] federal court does not have jurisdiction

27  over a defendant unless the defendant has been served properly under Fed. R. Civ. P. 4").

28  When a defendant challenges the sufficiency of service, the plaintiff bears the burden of

demonstrating that proper service was made. *Brockmeyer v. May*, 383 F.3d 798, 801 (9th Cir. 2004).

**B.    Analysis**

Defendants Wexler, Willard Olauson, and Kelly Olauson join the prior Motion to Dismiss, and separately move for dismissal on the bases of insufficient service, lack of personal jurisdiction, and failure to state a claim upon which relief may be granted. Defendants request that the Court dismiss them because Allen failed to properly serve them with a federal court summons and copy of the Complaint, and thus the Court lacks jurisdiction over them. In response, Plaintiff provides Declarations of Diligence from the three process servers. (Doc. 39, Ex. G).

With respect to Defendant Wexler, the process server provides that the guard at the gated community in which Wexler resides confirmed his address but that the individual who opened the door indicated that the server was at the wrong address. Despite the individual's refusal, the process server served him as he was 18 years or older and stated that he resided at the address. Defendant Wexler provides that he was away from the house at the alleged time of process and denies knowledge of the individual who opened the door, but he does not deny that he resided there. (Doc. 30, Ex. 1).

Similarly, the process server for Kelly Olauson declares that after several attempts to effect personal service, an individual who refused to share his name answered the door, and after the server informed him of the documents, the individual closed the door, prompting the process server to leave the documents in front of the door. Defendant Kelly Olauson asserts that he and his family were away on vacation at the alleged time of service and only their female housekeeper, who is not authorized to accept process on his behalf, had access to the home at that time. (Doc. 30, Ex. 3).

Finally, the Declaration of Diligence for Defendant Willard Olauson provides that after several attempts, a "live-in female" named Emily Freeman was served. Defendant asserts that he and his ex-wife only occasionally stay at the address stated and that the process server left the materials with a female housekeeper who was not authorized to accept

1   service on his behalf. (Doc. 30, Ex. 2).

2       Notwithstanding the clear discrepancies between the declarations of the process

3   servers and Defendants' affidavits, Plaintiff has satisfied his burden of serving Defendants

4   by leaving a copy of the summons and complaint at the individual's dwelling or usual place

5   of abode with someone of suitable age and discretion who resides there in accordance with

6   Federal Rule 4(e).

7       Nevertheless, the moving Defendants are nonetheless dismissed because, according

8   to his own allegations, Plaintiff's suit against them is in their capacity as equity

9   shareholders/investors in QOL, an Arizona limited liability company. (Doc. 1, Ex. 2, ¶¶ 2,

10  14–15). To the extent Plaintiff wishes to implicate Defendants for their failure to take action

11  while Defendants Smart engaged in tortious conduct and breach of the settlement agreement,

12  Defendants are protected under A.R.S. § 29-651, which provides that "[a] member, manager,

13  employee, officer or agent of a limited liability company is not liable, solely by reason of

14  being a member, manager, employee, officer or agent, for the debts, obligations and liabilities

15  of the limited liability company whether arising in contract or tort, under a judgment, decree

16  or other of a court or otherwise." Moreover, § 29-656 provides that "[a] member of a limited

17  liability company, solely by reason of being a member, is not a proper party to proceedings

18  by or against a limited liability company unless the object is to enforce a member's right

19  against or liability to the limited liability company."

20      Additionally, to the extent that Plaintiff's complaint alleges that Defendants are

21  directly liable for Smart's actions because they "put him in control of the company", (¶ 165),

22  those claims are barred by the Release Agreement, as previously set forth, because the

23  appointment of Smart as Manager occurred before the effective date of the Release

24  Agreement. Section 1(b) of the Release Agreement provides that "Allen . . . releases QOL,

25  the Members . . . from any and all claims asserted in the Lawsuit or that could have been

26  asserted in the Lawsuit, by reason of any matter, cause, or claim arising prior to the date of

27  this Release Agreement." Plaintiff could have raised such claims during the previous lawsuit,

28  and thus is barred from doing so here. Moreover, Plaintiff has not alleged that the moving

1   Defendants acted in their personal capacities, or acted outside the scope of their role as

2   members of the LLC, Therefore, Defendants Gregory Wexler, Kelly Olauson and Willard

3   Olauson are dismissed.

4   **III.    Plaintiff's Motion for Preliminary Injunction**

5       **A.    Legal Standard**

6       A preliminary injunction is "an extraordinary remedy never awarded as of right."

7   *Winter v. Natural Res. Def. Council, Inc.*, 129 S.Ct. 365, 376 (2008). "A plaintiff seeking a

8   preliminary injunction must establish that he is likely to succeed on the merits, that he is

9   likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

10   equities tips in his favor, and that an injunction is in the public interest." *Id.* at 374. All four

11   factors must be satisfied for the Court to grant a preliminary injunction. *Alliance for the Wild*

12   *Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). The Ninth Circuit considers these

13   four elements using a "sliding scale" approach, where "the elements of the preliminary

14   injunction test are balanced, so that a stronger showing of one element may offset a weaker

15   showing of another." *Id.* at 1131. However, the element of irreparable injury is not subject

16   to balance; the moving party must "demonstrate that irreparable injury is *likely* in the absence

17   of an injunction." *Winter*,  55 U.S. at 23 (emphasis in original).

18       At the preliminary injunction stage, Plaintiff has the burden of proof. *Preminger v.*

19   *Principi*, 422 F.3d 815, 823 n.5 (9th Cir. 2005). In addition, because the function of a

20   preliminary injunction is to preserve status quo pending determination of the merits, there

21   is heightened scrutiny where a movant seeks to alter, as is the case here, rather than maintain

22   the status quo. *Dahl v. HEM Pharms. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993) (holding that

23   mandatory, as opposed to prohibitory, injunctions are subject to heightened scrutiny).

24       **B.    Analysis**

25       On December 29, 2010, while Plaintiff's case was pending in the Superior Court, he

26   filed a motion for preliminary injunction. Soon after, Defendant QOL removed the matter to

27   this Court. On April 22, 2011, after Defendants had filed the motions to dismiss discussed

28   above, Plaintiff filed a notice of his pending preliminary injunction motion. (Doc. 36).

1    Plaintiff's motion seeks injunctive relief requiring Defendants Smart and QOL "to cease all

2    contractual breaching, defamatory, blacklisting and tortious behavior, and remove all

3    contractual breaching, blacklisting and defamatory content on the internet related in any

4    fashion to Allen, publicly posted in the form of interviews, press releases, forum posts, blog

5    posts, public statements and online comments." (*Id*.).

6          To meet the "irreparable harm" requirement, Plaintiff must do more than simply allege

7    imminent harm; he must demonstrate it. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844

8    F.2d 668, 674 (9th Cir. 1988). This requires Plaintiff to demonstrate by specific facts that

9    there is a credible threat of immediate and irreparable harm. *See* FED. R. CIV. P. 65(b). Mere

10   "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a

11   preliminary injunction." *Caribbean Marine*, 844 F.2d at 674. Allen has failed to demonstrate

12   any imminent risk of irreparable harm. Plaintiff's only assertion with respect to this element

13   is that he will suffer irreparable harm to his "reputation and credibility" if Defendants are not

14   enjoined. (Doc. 1, Ex. 7). To support his claim, he relies on various materials, including

15   interviews, blog posts, and online comments, many of which predate the Release Agreement.

16   As discussed above, the Release Agreement executed by the parties did not contain an

17   affirmative obligation that Defendants remove or delete previously published interviews,

18   blogs, web postings, or other articles from the internet. *See discussion supra* section I.B.

19   However, even limiting Plaintiff's claim to the allegedly defamatory statements made after

20   the Agreement, he nevertheless fails to allege any connection between these materials and

21   the risk of irreparable injury to him. Plaintiff has not made a clear showing of the likelihood

22   of irreparable injury, and that alone is fatal to his motion.

23         Even if Plaintiff had established a likelihood of irreparable harm, injunctive relief

24   would still be inappropriate because he has failed to demonstrate a likelihood of success on

25   the merits. Even though some of Plaintiff's claims survive the motions to dismiss, the

26   analysis set forth above does not establish that Plaintiff will likely succeed on those claims,

27   but rather only that he has succeeded in stating a claim upon which relief may be granted.

28   Accordingly, Plaintiff's Motion for Preliminary Injunction is denied.

1   **IV.     Plaintiff's Motion for Partial Summary Judgment**

2          **A.     Legal Standard**

3          Summary judgment is appropriate if the evidence, viewed in the light most favorable

4   to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact

5   and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

6   Substantive law determines which facts are material and "[o]nly disputes over facts that

7   might affect the outcome of the suit under the governing law will properly preclude the entry

8   of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "A fact

9   issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the

10  nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)

11  (quoting *Anderson*, 477 U.S. at 248). Thus, the nonmoving party must show that the genuine

12  factual issues "'can be resolved only by a finder of fact *because they may reasonably be*

13  *resolved in favor of either party*.'" *Cal. Architectural Bldg. Prods., Inc. v. Franciscan*

14  *Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*,  477 U.S. at 250).

15         **B.     Analysis**

16         Plaintiff moves for partial summary judgment against Defendant Smart on his breach

17  of contract, breach of covenant of good faith and fair dealing, defamation, injurious

18  falsehood/trade libel, and negligence. (Doc. 54). Along with his response, Defendant Smart

19  filed a Rule 56(d) motion to defer consideration of, or to deny, the motion. (Doc. 78).

20         As a initial matter, in its ruling on the Motion to Dismiss, filed by Smart, QOL and

21  3000 AD (Doc. 8), the Court dismissed, with leave to amend, count five (injurious

22  falsehood/trade libel), and dismissed, with prejudice, count eight (negligence). Therefore, to

23  the extent Plaintiff moves for summary judgment on those two counts, his motion is denied

24  as moot.

25         With respect to the remaining three counts, which survived dismissal, a motion for

26  summary judgment is premature at this stage: a Rule 16 conference has not been set, the

27  parties have not been authorized to engage in discovery, and Defendant has not yet answered

28  the Complaint. *See* FED. R. CIV. P. 56(b), (c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317,

1   322 (1986) (indicating that summary judgment is appropriate after "adequate time for

2   discovery"). Accordingly, Plaintiff's motion for partial summary is denied as premature in

3   part and moot in part. Defendant Smart's Rule 56(d) Motion (Doc. 78) is granted.

4                                **CONCLUSION**

5        Under Rule 15, "[t]he court should freely give leave [to amend] when justice so

6   requires." FED. R. CIV. P. 15(a)(2). Given that Plaintiff may be able to allege sufficient facts

7   to state a claim with regard to Counts 5 and 7, dismissal is with leave to amend.

8        As to the Motion to Dismiss filed by Smart, QOL, and 3000 AD (Doc. 8), **IT IS**

9   **HEREBY ORDERED** that:

10       (1) the motion is **DENIED** as to Counts 1, 2, and 3. Count 3 is denied only with

11  respect to Defendants Smart and QOL; it is granted with respect to 3000AD.

12       (2) the motion is **GRANTED** as to Counts 6, 10, 11 and 12.

13       (3) the motion is **GRANTED** with leave to amend as to Counts 4, 5, 7, 8 and 9.

14  Plaintiff shall have **30 days** from the date of this Order to file an amended complaint with

15  respect to Counts 5 and 7. If an amended complaint is not filed by **October 21, 2011**, Counts

16  4, 5, 7, 8 and 9 will be terminated consistent with this Order.

17       **IT IS FURTHER ORDERED** that the Motion to Dismiss filed by Defendants

18  Gregory and Jane Doe Wexler, Willard and Jane Doe Olauson, and Kelly and Janis Doe

19  Olauson (Doc. 30) is **GRANTED**. The Clerk of the Court is directed to terminate these

20  Defendants from this action.

21       **IT IS FURTHER ORDERED** that Plaintiff's Motion to Partial Summary Judgment

22  (Doc. 54) is **DENIED** as premature in part and moot in part and Defendant Smart's Rule

23  56(d) Motion (Doc. 78) is granted..

24       **IT IS FURTHER ORDERED** that Defendants Larry O'Rourke, III and Jane Doe

25  O'Rourke, Rick Hupp, Greg Klipstein and Jane Doe Klipstein, Bob Carlson, Jim Haney and

26  Jane Doe Haney, Eileen O'Rourke, Larry O'Rourke, Jr. and Janis Doe O'Rourke will be

27  dismissed **14 days** from the date of this Order if Plaintiff fails to show good cause before that

28  date for his failure to serve the Summons and Complaint.

1   **IT IS FURTHER ORDERED** directing the Clerk of the Court to terminate

2   Defendants Larry O'Rourke, III and Jane Doe O'Rourke, Rick Hupp, Greg Klipstein and

3   Jane Doe Klipstein, Bob Carlson, Jim Haney and Jane Doe Haney, Eileen O'Rourke, Larry

4   O'Rourke, Jr. and Janis Doe O'Rourke , without further notice, if Plaintiff fails to respond

5   to this Order within the time stated.

6   **IT IS FURTHER ORDERED** that Plaintiff's other pending motions, including

7   Motion to Strike Response and Motion to Seal (Doc. 76 ) and  Motion for Order Directing

8   the Preservation of Documents and Things (Doc. 81) are **DENIED**.

9   **IT IS FURTHER ORDERED** that Plaintiff's Motion to Rule upon Outstanding

10  Motion for Preliminary Injunction originally filed in Superior Court (Doc. 80) is **DENIED**

11  as moot. Plaintiff's Motion for Preliminary Injunction, originally filed in Maricopa County

12  Superior Court, is denied.

13  **IT IS FURTHER ORDERED** that Defendants' Response to, or in the alternative,

14  Motion to Strike Plaintiff's supplemental memorandum and request for expedited ruling on

15  his preliminary injunction motion (Doc. 101) is **GRANTED**. The Clerk of the Court is

16  directed to strike Doc. 89.

17  DATED this 22nd day of September, 2011.

18

19  _A. Murray Snow_____

20  G. Murray Snow
    United States District Judge

21

22

23

24

25

26

27

28